UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

VRA ENTERPRISES, LLC, *doing business as* PRECISION RX,

    Plaintiff,

v.

Case No. 8:24-cv-1523-KKM-AAS

CENTERS FOR MEDICARE AND MEDICAID SERVICES, and THE UNITED STATES DEPARTMENT OF JUSTICE,

    Defendants.
_____

## ORDER

VRA Enterprises, LLC, sues the Centers for Medicare and Medicaid Services (CMS) and the U.S. Department of Justice. Compl. (Doc. 1). VRA seeks declaratory relief that CMS unlawfully suspended $32 million in Medicare payments to which VRA is entitled and an injunction compelling the payments' release. *Id.* ¶¶ 54–73. The defendants move to dismiss, arguing (among other things) that subject-matter jurisdiction is lacking under the Medicare Act. MTD (Doc. 21). Because the defendants are right that the Medicare Act divests me of jurisdiction to consider VRA's claims, I grant the defendants' motion.

I.  BACKGROUND

   A. Regulatory Structure

The Medicare Act, 42 U.S.C. §§ 426–426a, 1395–1396, established social welfare "programs that provide medical benefits to the elderly and disabled," *Am. Acad. of Dermatology v. Dep't of Health & Hum. Servs.*, 118 F.3d 1495, 1496 (11th Cir. 1997). One such program is Medicare Part B, a voluntary "supplemental insurance program" run by CMS. *Banks v. Sec'y, Dep't of Health & Hum. Servs.*, 38 F.4th 86, 90 (11th Cir. 2022) (citing 42 U.S.C. §§ 1395j, 1395kk). This case involves the procedures that CMS, and the private contractors it employs,[1] use to investigate "credible allegations of fraud" against an entity that supplies services under the Medicare program—here, a pharmacy providing over-the-counter COVID-19 test kits to Medicare Part B beneficiaries. 42 U.S.C. § 1395y(o); *see* Compl. ¶ 10.

CMS regulations set out the procedures for suspending a Medicare provider's payments pending a fraud investigation. CMS may suspend Medicare payments to

---

[1] In administering Medicare Part B, CMS employs private contractors "that perform a variety of contractual services, including making coverage determinations, determining reimbursement rates and allowable payments, conducting audits of the claims submitted for payment, and adjusting payments and payment requests." *Fla. Med. Ctr. of Clearwater, Inc. v. Sebelius*, 614 F.3d 1276, 1279 n.3 (11th Cir. 2010) (citing 42 U.S.C. § 1395u). For simplicity, I generally refer to CMS and its private agents collectively as "CMS" below.

a provider or supplier if, after consulting with the Department of Health and Human Services Office of the Inspector General (OIG), "and, as appropriate, the Department of Justice," it determines "that a credible allegation of fraud exists against a provider or supplier." 42 C.F.R. § 405.371(a)(2). CMS need not notify the provider before suspending payments. *Id.* § 405.372(a)(4). But CMS must give the provider "an opportunity to submit a rebuttal statement as to why the suspension should be removed." *Id.* § 405.372(b)(2). After receiving a rebuttal statement, CMS must determine whether to lift the suspension. *Id.* §§ 405.372(b)(2), 405.375(a). The provider may not appeal that decision. *Id.* § 405.375(c). Suspended payments are effectively held in escrow until the fraud investigation is complete. *See True Health Diagnostics, LLC v. Azar*, 392 F. Supp. 3d 666, 677–78 (E.D. Tex. 2019).

    Suspension may not continue indefinitely. Every 180 days, CMS must assess whether good cause exists to lift the suspension and "[r]equest a certification from the OIG or other law enforcement agency" that an investigation is ongoing and continued suspension is warranted. 42 C.F.R. § 405.371(b)(2). Once CMS has suspended payments for eighteen months, good cause to lift the suspension is presumed to exist unless (1) OIG is considering or has instituted administrative action, or (2) DOJ requests that the suspension continue because it anticipates filing

3

a civil or criminal action. *Id.* § 405.371(b)(3). In any event, CMS may not continue suspension after an investigation ends unless there is "reliable evidence of an overpayment or that the payments to be made may not be correct." *Id.* § 405.372(d)(3)(ii).

Suspension ordinarily ends when CMS determines whether there has been an overpayment and issues an overpayment determination. *Id.* § 405.372(c)(1)(ii), (2)(i); *see id.* § 405.370(a) (defining "[s]uspension of payment" as "[t]he withholding of payment by a Medicare contractor from a provider or supplier of an approved Medicare payment amount before a determination of the amount of the overpayment exists, or until the resolution of an investigation of a credible allegation of fraud"). If CMS determines that no overpayment exists—and the provider has no other outstanding obligations to CMS or the Department of Health and Human Services—all suspended funds are released to the provider. *See id.* § 405.372(e). If CMS determines that there has been an overpayment, the provider may proceed through the administrative review process and ultimately obtain judicial review. *See* 42 U.S.C. § 1395ff(b)(1)(A) (citing 42 U.S.C. § 405(g)); 42 C.F.R. § 405.904(a)(2); *see also True Health*, 392 F. Supp. 3d at 678. CMS may decline to issue an

4

overpayment determination "until the resolution of the investigation" into the credible allegations of fraud. 42 C.F.R. § 405.372(c)(2)(ii).

### B. Suspension of VRA's Medicare Payments

VRA "operates a retail pharmacy in Tampa, Florida," and participated in a CMS "demonstration program designed to provide access to COVID-19 over-the-counter test kits to Medicare Part B beneficiaries" in 2022. Compl. ¶¶ 8–11.[2] CMS at first reimbursed VRA for test kits that it provided to beneficiaries under the program. *Id.* ¶¶ 11–12. But on November 23, 2022, "SafeGuard Services, LLC, a CMS contractor," stopped reimbursing VRA without explanation. *Id.* ¶ 12.

SafeGuard sent VRA a letter in early December 2022 explaining that CMS was suspending VRA's Medicare payments based on "credible allegations of fraud." Compl. ¶¶ 13, 37; (Doc. 21-1) (suspension letter); *see* 42 U.S.C. § 1395y(o); 42 C.F.R. § 371(a)(2). These allegations involved COVID-19 test kits for which VRA billed CMS, but which CMS claimed the beneficiaries never received. Compl. ¶¶ 13, 16. VRA responded to the fraud allegations, and SafeGuard resumed

---

[2] At the motion to dismiss stage, I accept the complaint's factual allegations as true and construe them in the light most favorable to VRA. *Pielage v. McConnell*, 516 F.3d 1282, 1284 (11th Cir. 2008).

payments for the rest of December and into early January 2023. *Id.* ¶¶ 14–15; 42 C.F.R. § 405.372(b)(2). But SafeGuard suspended payments again in January, and DOJ issued a civil investigative demand seeking details about VRA's participation in the COVID-19 test kit project. Compl. ¶¶ 15–17.

Following this second suspension, VRA went back and forth with CMS and DOJ, providing evidence that VRA believes shows it did not defraud the Medicare program. *Id.* ¶¶ 18–19, 21–26, 38–47. All the same, CMS twice extended the suspension of VRA's Medicare payments in 180-day increments. *Id.* ¶ 20; *see* 42 C.F.R. § 405.371(b)(2). As of the filing of the complaint, the "suspension ha[d] been in effect for more than [eighteen] months" and VRA "ha[d] received no explanation or justification from CMS or DOJ regarding the continued payment suspension." Compl. ¶¶ 33, 35.

Because the Medicare regulations provide that CMS must resume payments after 18 months unless (1) OIG is considering or has instituted administrative action or (2) DOJ requests continued suspension because it anticipates filing an action, VRA contends that the continued suspension of its payments is unlawful. *Id.* ¶¶ 28, 37; *see* 42 C.F.R. §§ 405.371(b)(3). It asks for declaratory judgment that the suspension violates the Medicare regulations, Compl. ¶¶ 54–57 (Count I), and an

order under the Administrative Procedure Act requiring the defendants to lift the suspension and not reimpose it, *id.* ¶¶ 58–73 (Counts II & III), Prayer for Relief.

The defendants move to dismiss for lack of subject-matter jurisdiction and because VRA's complaint fails to state a claim for relief. MTD; *see* FED. R. CIV. P. 12(b)(1), (6).

## II.   LEGAL STANDARD

Federal Rule of Civil Procedure 8(a)(2) requires "a short and plain statement of the claim showing that the pleader is entitled to relief." "To survive a motion to dismiss" for failure to state a claim, a plaintiff must plead sufficient facts to state a claim that is "plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible on its face when a "plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

A motion to dismiss for lack of subject-matter jurisdiction under Rule 12(b)(1) may either be a "facial" or "factual" attack on a court's jurisdiction to hear the case. *See Lawrence v. Dunbar*, 919 F.2d 1525, 1528–29 (11th Cir. 1990) (per curiam); *see also Hakki v. Sec'y, Dep't of Veterans Affs.*, 7 F.4th 1012, 1022–23 (11th Cir. 2021). A facial attack requires the court look only to the pleadings to determine

whether the plaintiff has "sufficiently alleged a basis of subject matter jurisdiction." *Lawrence*, 919 F.2d at 1529 (quotation omitted). A factual attack "challenge[s] 'the existence of subject matter jurisdiction in fact, irrespective of the pleadings, and matters outside the pleadings, such as testimony and affidavits, are considered.'" *Id.* (quotation omitted). If a court finds it lacks jurisdiction, it is "without power to enter judgment . . . and must dismiss the case." *Hakki*, 7 F.4th at 1023.

When considering a 12(b)(6) motion or a facial 12(b)(1) motion, the court accepts all the factual allegations in the complaint as true and construes them in the light most favorable to the plaintiff. *See Pielage v. McConnell*, 516 F.3d 1282, 1284 (11th Cir. 2008); *Lawrence*, 919 F.2d at 1529. "[T]he generally prefer[red] approach" is to address a 12(b)(1) motion first because that motion goes to the court's jurisdiction to hear the dispute. *Jones v. Georgia*, 725 F.2d 622, 623 (11th Cir. 1984).

## III. ANALYSIS

The defendants argue that I lack subject-matter jurisdiction over VRA's claims because 42 U.S.C. § 405(h) (as incorporated by the Medicare Act, *see* 42 U.S.C. § 1395ii) provides that federal courts have jurisdiction to review claims arising under the Medicare Act only after they have been channeled through the act's administrative review processes. MTD at 9–12. VRA does not dispute that § 405(h)

facially bars review of its claim, but it argues that review is nevertheless available under an exception outlined in *Shalala v. Illinois Council on Long Term Care, Inc.*, 529 U.S. 1 (2000). Opp. (Doc. 28) at 6–9. For completeness, I begin by briefly explaining the Medicare Act's review scheme and why § 405(h) bars VRA's claim if the exception does not apply. Then I address VRA's argument that it falls within the exception. Because it does not, VRA's complaint must be dismissed for lack of subject-matter jurisdiction.

### A. Section 405(h) Facially Bars VRA's Claims

Section 405(h) "channels most, if not all, Medicare claims through [a] special review system." *Illinois Council*, 529 U.S. at 8; *see* 42 U.S.C. § 1395ii (incorporating 42 U.S.C. § 405(h)). As modified by its incorporation into Medicare, it provides in full that:

> The findings and decision of the [Secretary of the Department Health and Human Services] after a hearing shall be binding upon all individuals who were parties to such hearing. No findings of fact or decision of the [Secretary] shall be reviewed by any person, tribunal, or governmental agency except as [provided in 42 U.S.C. § 405(g)]. No action against the United States, the [Secretary], or any officer or employee thereof shall be brought under section 1331 or 1346 of Title 28 to recover on any claim arising under [the Medicare Act].

Section 405(g), as incorporated by § 1395ff(b)(1)(A), provides for judicial review of Medicare decisions that have proceeded through administrative review. Based on its abrogation of jurisdiction under 28 U.S.C. § 1331 and § 1346, then, 42 U.S.C. § 405(h) ordinarily divests federal courts of jurisdiction to hear claims "arising under" the Medicare Act unless those claims have been channeled through the Medicare Act's review provisions. *See Heckler v. Ringer*, 466 U.S. 602, 614–15 (1984); *Am. Acad. of Dermatology*, 118 F.3d at 1497–99. A claim arises under the Medicare Act if it is "inextricably intertwined" with a claim for benefits under the act. *Ringer*, 466 U.S. at 614.

The parties do not dispute that VRA's claim to have its Medicare payment suspension lifted arises under the Medicare Act. *See* MTD at 10; Opp. at 6–9. Nor could they, for VRA's principal requested relief is that CMS immediately pay it money that VRA believes it is owed under the Medicare Act. *See* Compl. at 13. As VRA's claim is "a claim that [it] should be paid" Medicare funds, *Heckler*, 466 U.S. at 614, it arises under the Medicare Act and must be channeled through the Medicare Act's review provisions unless an exception applies, *see Neurological Assocs.-H. Hooshmand, M.D., P.A. v. Bowen*, 658 F. Supp. 468, 472 (S.D. Fla. 1987); *see also Ancillary Affiliated Health Servs., Inc. v. Shalala*, 165 F.3d 1069, 1071

(7th Cir. 1998). As VRA does not claim to have proceeded through the administrative review process, I turn to the exception.

### B. VRA's Claims Do Not Fall Within the *Illinois Council* Exception

VRA argues that subject-matter jurisdiction exists based on an exception recognized in *Shalala v. Illinois Council on Long Term Care, Inc. See* Opp. at 6–9 (citing 529 U.S. 1). *Illinois Council* held that the Medicare Act's § 1395ii provision does not incorporate the Social Security Act's § 405(h) "where application of § 405(h) would not simply channel review through the agency, but would mean no review at all." 529 U.S. at 19. The "no review at all" standard is high: "the question is whether, as applied generally to those covered by a particular statutory provision, hardship likely found in many cases turns what appears to be simply a channeling requirement into *complete* preclusion of judicial review." *Id.* at 22–23 (emphasis in the original). A plaintiff seeking to invoke *Illinois Council* must thus show that, as a practical matter, if judicial review is not made available now, it will not be available for any plaintiff that might ever bring the same claim. *See id.*; *see also Council for Urological Ints. v. Sebelius*, 668 F.3d 704, 711 (D.C. Cir. 2011).

VRA says it meets that standard. VRA reads the Medicare regulations to provide that once "CMS makes a final decision to continue suspension, the

11

suspension decision remains in place until certain events occur." Opp. at 8. It says those events are either (1) a determination whether an overpayment exists (at which point judicial review is available or unnecessary); (2) the resolution of an investigation (at which point judicial review will be available or unnecessary); or (3) an extension of the suspension beyond eighteen months based on a request from OIG or DOJ. *Id.* VRA claims that because it falls into this last category—for which the Medicare Act does not provide review—it falls into the *Illinois Council* exception. *Id.*

But the Medicare Act does provide review. VRA's third event—extension past eighteen months—is not CMS's final word. That exception merely allows CMS to extend a payment suspension while either OIG or DOJ continues to investigate an allegation of fraud. *See* 42 C.F.R. § 405.371(b)(3). The regulations likewise allow CMS to withhold an overpayment determination until after the "resolution of the investigation." *Id.* § 405.372(c)(2)(ii). Yet once that investigation is complete—at the latest—CMS must determine whether an overpayment exists. *Id.* § 405.372(c)(2)(i). That determination is an "initial determination" subject to administrative appeal and, ultimately, judicial review. *See* 42 U.S.C. § 1395ff(b)(1)(A) (citing 42 U.S.C. § 405(g)); 42 C.F.R. § 405.904(a)(2); *see also True Health*, 392 F. Supp. 3d at 678.

VRA thus fails to show the "*complete* preclusion of judicial review" necessary to invoke the *Illinois Council* exception. 529 U.S. at 22–23 (emphasis in the original).

That conclusion is consistent with the weight of persuasive authority that the government presents. VRA tries to distinguish those cases because they did not deal with a suspension beyond eighteen months for which an overpayment determination had not yet been issued. *See* Opp. at 11–13. To be sure, in the cases the government cites either the suspension had been pending for less than eighteen months,[3] or CMS had issued an overpayment determination.[4] But that is a distinction without a difference. As discussed above, VRA will be able to present its claims to CMS and to obtain judicial review if CMS determines that VRA was overpaid. The

---

[3] *See, e.g.*, *Clarinda Home Health v. Shalala*, 100 F.3d 526, 530 (8th Cir. 1996); *San Diego Comprehensive Pain Mgmt. Ctr., Inc. v. Becerra*, No. 21-CV-01739-BAS-WVG, 2021 WL 5741465, at *2–3 (S.D. Cal. Dec. 2, 2021); *PainMD, LLC v. Azar*, No. 3:18-CV-01346, 2019 WL 4016120, at *1 (M.D. Tenn. Aug. 26, 2019); *Neurological Assocs.*, 658 F. Supp. at 469; *Total Renal Lab'ys, Inc. v. Shalala*, 60 F. Supp. 2d 1323, 1325–28 (N.D. Ga. 1999); *see also* MTD at 10 n.3.

[4] *See, e.g.*, *Ancillary Affiliated Health Servs.*, 165 F.3d at 1069; *Brooks Home Care Servs., Inc. v. Becerra*, No. 3:23-CV-0477-S, 2024 WL 1348426, at *1 (N.D. Tex. Mar. 29, 2024); *Reg'l Home Health Care, Inc. v. Azar*, 488 F. Supp. 3d 827, 832 (S.D. Iowa 2020), *aff'd sub nom. Reg'l Home Health Care, Inc. v. Becerra*, 19 F.4th 1043 (8th Cir. 2021); *Simply Home Healthcare, LLC v. AdvanceMed Corp.*, No. 19 C 2313, 2020 WL 419416, at *2 (N.D. Ill. Jan. 27, 2020), *aff'd*, 849 F. App'x 170; *Total Renal Lab'ys*, 60 F. Supp. 2d at 1325–28 (N.D. Ga. 1999); *see also* MTD at 10 n.3.

suspension's eighteen-month duration is not legally significant for purposes of federal jurisdiction.

VRA objects that it is unreasonable to force it to "wait for the *potential* that CMS issues an overpayment determination" because "an overpayment determination is an entirely separate agency action from suspension." Opp. at 9–10 (emphasis partially omitted). Not so. Suspension is an interim remedy designed to protect the Medicare program "from suffering greater loses" while CMS investigates the possibility of overpayment based on fraud. *Clarinda Home Health v. Shalala*, 100 F.3d 526, 529 (8th Cir. 1996). And the Medicare regulations require CMS to make an overpayment determination once it has suspended payments based on credible allegations of fraud. *See* 42 C.F.R. § 405.372(c)(2). That determination will be appealable once made, and VRA agrees that review will be available then. *See* Opp. at 8; *see also Simply Home Health Care, LLC v. Advancemed Corp.*, 849 F. App'x 170, 172 (7th Cir. 2021) (per curiam) (rejecting argument that Medicare provider could not "challeng[e] the suspension process in an administrative appeal of the final overpayment determination").[5]

---

[5] VRA also relies on *Aquavella v. Richardson*, which "conclude[d] that the suspension of payments . . . under the Medicare Act with no formal action thereafter for many months is

Even still, VRA points out that forcing it to wait will subject it to harms "that cannot be compensated later, such as the loss of economic opportunity, loss of business opportunity, and harm to VRA's reputation." Opp. at 10 n.1. Those certainly constitute fair policy problems with the review procedures, yet precedent makes clear that § 1395ii incorporates § 405(h) despite these concerns. *See Illinois Council*, 529 U.S. at 13 ("[Section 405(h)] assures the agency greater opportunity to apply, interpret, or revise policies, regulations, or statutes without possibly premature interference by different individual courts[,] [b]ut this assurance comes at a price, namely, occasional individual, delay-related hardship."); *Ringer*, 466 U.S. at 627 ("Congress must have felt that cases of individual hardship resulting from delays in the administrative process had to be balanced against the potential for overly casual or premature judicial intervention in an administrative system that processes literally millions of claims every year."). While VRA may very well suffer irremediable harms

---

a reviewable final agency action." 437 F.2d 397, 405 (2d Cir. 1971); *see* Opp. at 11. Yet the parties in *Aquavella* "agree[d] that the Medicare Act by its terms d[id] not provide for judicial review," 437 F.2d at 400. And the Second Circuit decided that case under an earlier version of the Medicare regulations and before either *Illinois Council* or *Ringer*. It is accordingly of little persuasive value here.

while it awaits review, that is the consequence of the review scheme that Congress erected.

## IV.   CONCLUSION

The outcome here might be different had VRA brought a mandamus action seeking to compel CMS to render an overpayment determination unlawfully withheld. *See In re Bayou Shores SNF, LLC*, 828 F.3d 1297, 1313 (11th Cir. 2016) ("[T]he great weight of authority from other circuits has almost uniformly found that § 405(h) does not necessarily deprive district courts of mandamus jurisdiction over Medicare claims."). Were CMS simply withholding that determination without any legal basis, thereby barring VRA from seeking administrative and judicial review, mandamus might be warranted. But VRA does not allege that CMS is withholding a determination—only that CMS should have resumed payments pending an overpayment determination. Because that claim arises under the Medicare Act and VRA will be able to present it to the secretary once an overpayment determination is made, § 405(h) requires this action's dismissal.

Accordingly, the following is **ORDERED**:

1. The defendants' Motion to Dismiss (Doc. 21) is **GRANTED**.

2. This case is **DISMISSED WITHOUT PREJUDICE**.

3. The clerk is directed to **ENTER JUDGMENT**, which shall read: "This case is dismissed without prejudice."

4. The clerk is further directed to **TERMINATE** any pending deadlines and to **CLOSE** this case.

**ORDERED** in Tampa, Florida, on July 3, 2025.

*Kathryn Kimball Mizelle*
Kathryn Kimball Mizelle
United States District Judge